No. 25-10323

IN THE

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————

## Deborah Laubscher and Robert Laubscher,

*Plaintiffs-Appellants,*

*v.*

## Gwinnett County,

*Defendant-Appellee.*

————

On appeal from the United States District Court
for the Northern District of Georgia
Case No. 1:24-cv-1891-LMM
Hon. Leigh Martin May

# APPELLANTS' OPENING BRIEF

Zack Greenamyre
MITCHELL SHAPIRO
  GREENAMYRE & FUNT, LLP
881 Piedmont Avenue
Atlanta, Georgia 30309
(404) 812-4747

Athul K. Acharya
*Counsel of Record*
Sara K. Rosenburg
PUBLIC ACCOUNTABILITY
P.O. Box 14672
Portland, Oregon 97293
(503) 383-9492

*Counsel for Plaintiffs-Appellants*
May 23, 2025

*Laubscher v. Gwinnett County*
No. 25-10323

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Eleventh Circuit Rules 26.1-1 through 26.1-5, Plaintiffs-Appellants certify that the following is a list of all judges, attorneys, persons, associations of persons, firms, partnerships, corporations, and other legal entities that may have an interest in the outcome of this appeal and the case below, including subsidiaries, conglomerates, affiliates and parent corporations, including publicly held corporations that own 10% or more of any party's stock and other identifiable legal entities related to a party:

1. Acharya, Athul K., *Appellate Counsel for Plaintiffs*

2. Allied World National Assurance Company, *Defendant's insurer*

3. Britt, Russell Alan, *Counsel for Defendant*

4. Funt, Samantha Jill, *Counsel for Plaintiffs*

5. Gemini Insurance Company, *Defendant's insurer*

6. Greenamyre, Zack, *Counsel for Plaintiffs*

7. Gwinnett County, *Defendant*

8. Hall Booth Smith, PC, *Counsel for Defendant*

9. Laubscher, Deborah, *Plaintiff*

10. Laubscher, Robert, *Plaintiff*

11. May, Leigh Martin, *U.S. District Judge*

12. Mitchell Shapiro Greenamyre & Funt LLP, *Counsel for Plaintiffs*

C-1 of 2

13.   Princeton Excess and Surplus Lines Insurance Company, *Defendant's insurer*

14.   Public Accountability, *Appellate Counsel for Plaintiffs*

15.   Rosenburg, Sara K., *Appellate Counsel for Plaintiffs*

16.   Safety National Casualty Corporation, *Defendant's insurer*

17.   Walker, Mitchell Blake, *Counsel for Defendant*

18.   Ware, R. David, *Counsel for Defendant*

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated:  May 23, 2025          Respectfully submitted,

By:  */s/Athul K. Acharya*
         Athul K. Acharya

PUBLIC ACCOUNTABILITY
Counsel for Plaintiffs-Appellants

# ORAL ARGUMENT STATEMENT

Plaintiffs-Appellants Deborah Laubscher and Robert Laubscher respectfully request oral argument.  This appeal presents difficult questions about the application of two complex statutory and regulatory schemes— the Americans with Disabilities Act and the Rehabilitation Act—to a nuanced set of facts.  Oral argument would aid the Court in reaching a decision.

# TABLE OF CONTENTS

Certificate of Interested Persons ........................................................ C-1

Oral Argument Statement .................................................................... i

Table of Contents ................................................................................ ii

Table of Authorities .......................................................................... iv

Statement of Jurisdiction .................................................................... 1

Introduction ........................................................................................ 2

Issues Presented .................................................................................. 4

Statement of the Case ......................................................................... 5

1.    The ADA and RA prohibit disability discrimination in public
      services, including police services. .............................................. 5

2.    Dani, a young person disabled by mental illness, experiences a
      mental-health crisis. ................................................................... 7

3.    Gwinnett County responds to mental-health crises with police
      officers untrained in crisis intervention. ...................................... 8

4.    Kevin Mendez, a police officer untrained in crisis intervention,
      kills Dani. ................................................................................. 11

5.    The district court dismisses the Laubschers' claims, ruling
      that the accommodations they described—such as crisis-
      intervention training—were unreasonable. ............................... 16

Standard of Review ........................................................................... 18

Summary of Argument ...................................................................... 19

Argument ........................................................................................... 22

1.    Gwinnett County discriminated against Dani Laubscher
      because it failed to reasonably accommodate Dani's mental
      disability. ................................................................................. 22

      1.1.   Under the ADA and RA, public entities must adapt their
             services to reasonably accommodate disabled people. ....... 23

1.2.    The Laubschers met their burden to identify facially reasonable ways emergency services can accommodate people with mental disabilities. ........................................25

1.3.    Gwinnett didn't meet its burden to show those accommodations would fundamentally alter its emergency services—and at the pleadings stage, it couldn't. ..................................................................31

1.4.    The Laubschers' proposed accommodations would not fundamentally alter Gwinnett's emergency services...........33

1.5.    The district court reached a contrary conclusion by redefining some of the Laubschers' proposed accommodations and disregarding the rest.......................35

2.    Gwinnett County is liable in damages. .....................................38

2.1.    Damages liability under the ADA and RA turns on deliberate indifference....................................................39

2.2.    Gwinnett acted with deliberate indifference by knowingly sending armed officers untrained in crisis response to mental-health crises. ......................................................40

Conclusion ...............................................................................45

# TABLE OF AUTHORITIES

## CASES

\* *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts U.S., Inc.*,
900 F.3d 1270 (11th Cir. 2018)...........23–25, 30, 34, 38, 40, 43, 45

*Bingham v. Thomas*,
654 F.3d 1171 (11th Cir. 2011)...................................... 18, 35, 38

*Bircoll v. Miami-Dade Cnty.*,
480 F.3d 1072 (11th Cir. 2007)................................................ 7, 38

*Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.*,
133 F.3d 816 (11th Cir. 1998)...................................................... 6, 7

*Broomall v. State*,
391 S.E.2d 918 (Ga. 1990)........................................................ 22

\* *Crane v. Lifemark Hosps., Inc.*,
898 F.3d 1130 (11th Cir. 2018)........................................ 39, 42, 43

*Farmer v. Brennan*,
511 U.S. 825 (1994)................................................................. 40

*Isaiah v. JPMorgan Chase Bank*,
960 F.3d 1296 (11th Cir. 2020)............................................... 18, 32

*J.S., III ex rel. J.S., Jr. v. Houston Cnty. Bd. of Educ.*,
877 F.3d 979 (11th Cir. 2017) (per curiam).............................. 6, 23

*Jones v. Bock*,
549 U.S. 199 (2007)................................................................. 18

*Karantsalis v. City of Miami Springs*,
17 F.4th 1316 (11th Cir. 2021) (per curiam) ........ 18, 23, 25, 30, 35

*L.C. ex rel. Zimring v. Olmstead*,
138 F.3d 893 (11th Cir. 1998)...................................................... 6

*L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*,
  55 F.4th 1296 (11th Cir. 2022) ..................................... 6, 24, 35, 37

\* *Liese v. Indian River Cnty. Hosp. Dist.*,
  701 F.3d 334 (11th Cir. 2012)....................6, 24, 30, 39, 40, 42–45

*Lucas v. W.W. Grainger, Inc.*,
  257 F.3d 1249 (11th Cir. 2001)..............................................32–34

*Nat'l Ass'n of the Deaf v. Florida*,
  980 F.3d 763 (11th Cir. 2020)............................................. 24, 32, 34

*Olmstead v. L.C. ex rel. Zimring*,
  527 U.S. 581 (1999) ...................................................................... 6

*Penn. Dep't of Corr. v. Yeskey*,
  524 U.S. 206 (1998) ...................................................................... 7

\* *PGA Tour, Inc. v. Martin*,
  532 U.S. 661 (2001) ............................................... 6, 23, 32, 33, 38

*Robinson v. California*,
  370 U.S. 660 (1962) .................................................................... 22

\* *Schaw v. Habitat for Human. of Citrus Cnty., Inc.*,
  938 F.3d 1259 (11th Cir. 2019).......... 26, 28, 29, 31, 32, 34, 35, 38

*Schwarz v. City of Treasure Island*,
  544 F.3d 1201 (11th Cir. 2008)..............................................31–34

*Shotz v. Cates*,
  256 F.3d 1077 (11th Cir. 2001)................................................... 18

\* *Silva v. Baptist Health S. Fla., Inc.*,
  856 F.3d 824 (11th Cir. 2017)....................................24, 39, 42–44

*Tennessee v. Lane*,
  541 U.S. 509 (2004) ................................................................. 5, 23

v

\* *U.S. Airways v. Barnett*,
   535 U.S. 391 (2002) ........................................................ 24, 26, 31

*Williams v. DeKalb Cnty.*,
   No. 23-738, Dkt. 16 (N.D. Ga. Sept. 21, 2023)............................ 37

*Willis v. Conopco, Inc.*,
   108 F.3d 282 (11th Cir. 1997)..................................................... 26

**STATUTES**

28 U.S.C. § 1291 ............................................................................. 1

28 U.S.C. § 1331 ............................................................................. 1

29 U.S.C. § 794 .................................................................... 6, 16, 25

42 U.S.C. § 12101 ......................................................................... 5, 6

42 U.S.C. § 12102 ........................................................................... 16

42 U.S.C. § 12131 ........................................................................... 16

42 U.S.C. § 12132 ........................................................................ 6, 25

**RULES**

Fed. R. App. P. 4 ............................................................................ 1

**REGULATIONS**

28 C.F.R. § 35.130........................................................... 24, 25, 31

28 C.F.R. Pt. 35, App. B.................................................................. 7

# STATEMENT OF JURISDICTION

Plaintiffs Deborah Laubscher and Robert Laubscher, the surviving parents of Jonathan "Dani" Laubscher, appeal the district court's decision dismissing their claims against Defendant Gwinnett County, Georgia. The district court had jurisdiction over the Laubschers' Americans with Disabilities Act and Rehabilitation Act claims under 28 U.S.C. § 1331. On October 25, 2024, it issued its final judgment dismissing those claims. A22. The Laubschers timely moved for reconsideration, A24, which the district court denied on January 3, 2025. A27. The Laubschers timely appealed on January 31. A28; Fed. R. App. P. 4(a)(4)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

# INTRODUCTION

Not all emergencies are created equal.  Helping someone in the grip of a mental-health crisis is not the same as preventing a burglary or stopping a murderer.  The State of Georgia recognizes this, which is why it offers a crisis-intervention training course at its police academies.  Such training is industry standard for police officers, who—in addition to preventing burglaries and stopping murderers—must often respond to calls for mentally disabled people in crisis.  With crisis-intervention training, officers can offer these people what they offer the rest of the public—help.

That parity is the essence of what the Americans with Disabilities Act and the Rehabilitation Act require: an equal opportunity for people with disabilities, including mental disabilities, to benefit from public services.  And in fact, Georgia's crisis-training course is expressly designed to teach officers to meet the requirements of the ADA and RA.  In the language of the Acts, crisis training is a way for police departments to ensure that they *reasonably accommodate* people with mental disabilities.

Gwinnett County does not crisis-train its officers.  Nor does it send mental-health clinicians as first responders, as many other municipalities do.  Nor does it make other accommodations, like staffing remote clinicians to help de-escalate crises over the phone.  Instead, Gwinnett sends untrained, armed police officers to crisis calls and hopes for the best.

What happened here was the predictable result.  Gwinnett officers responded to a crisis call for Dani Laubscher, a young person with

schizoaffective disorder caught in the throes of a mental-health episode. Dani was holding a small knife and threatening to commit suicide, but hadn't attacked or threatened anyone else. Lacking crisis training, however, the officers yelled conflicting commands, pointed their weapons, made threats, and escalated the crisis—until at last one of them shot and killed Dani. In short, Gwinnett's emergency services failed to reasonably accommodate Dani's mental disability, and as a result, Dani died.

Dani's parents sued Gwinnett under the ADA and RA. The district court dismissed their claims because, in its view, they had asked it to micromanage police operations at the scene of an emergency in ways that might put the safety of officers or others at risk. But Dani's parents had also identified upstream *policy* accommodations—giving officers crisis training, properly staffing a mental-health co-responder unit, hiring mental-health clinicians who could try to de-escalate over the phone—that would have equipped the first responders to *help* rather than kill Dani. The district court overlooked those accommodations when it dismissed the Laubschers' claims.

This Court should reverse. The Laubschers identified policy accommodations that were at least facially reasonable—in fact, they're industry standard—and that's all they needed to do to state a reasonable-accommodation claim. And because they also alleged that Gwinnett officials knowingly failed to offer those accommodations, they have stated claims for damages. This Court should let their claims proceed.

3

# ISSUES PRESENTED

1. **Reasonable accommodation.** To state a reasonable-accommodation claim, a plaintiff must identify an accommodation that "seems reasonable on its face." The Laubschers identified several ways Gwinnett could've adapted its emergency services—for instance, by training its officers in crisis intervention—that are industry-standard practices for accommodating people with mental disabilities. Did the Laubschers meet their initial burden to show that reasonable accommodations were possible?

2. **Deliberate indifference.** To seek damages under the ADA and RA, a plaintiff must also show that the defendant knew that harm to a federally protected right was substantially likely and failed to take corrective action. The Laubschers alleged that top Gwinnett officials knew Gwinnett was sending armed police officers untrained in crisis intervention to mental-health crises—and allowed it to continue. Can the Laubschers seek damages?

# STATEMENT OF THE CASE

When Deborah Laubscher called 9-1-1 and asked for help for her child Dani, who had a mental illness and was behaving erratically, Gwinnett County sent Kevin Mendez, a police officer.  A10 at 12–13, 28. Gwinnett doesn't require its police officers to take crisis-intervention training, and few do.  A10 at 25, 16.  So Mendez had no such training, but he arrived at the Laubscher home and assumed command of the response anyway.  A10 at 28.

Two minutes later, he shot Dani Laubscher and killed them.[1]  Mendez Video 00:25–2:48; A10 at 31.

## 1.    The ADA and RA prohibit disability discrimination in public services, including police services.

Because this case is about whether Gwinnett County's emergency services discriminated against mentally disabled people like Dani, some background on the law of disability discrimination is in order.

The ADA provides a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  It forbids disability discrimination under three titles:  Title I (employment), Title II (public services), and Title III (public accommodations).  *Tennessee v. Lane*, 541 U.S. 509, 516–17 (2004).

Title II, which applies here, was modeled after § 504 of the RA. *Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.*, 133 F.3d

---

[1] In life, Dani used gender-neutral pronouns.  A10 at 4.

816, 821 (11th Cir. 1998) ("Congress intended Title II to work in the same manner as Section 504 of the Rehabilitation Act."). The main difference between the two statutes is that Title II covers public entities, while § 504 covers recipients of federal funding. *Compare* 42 U.S.C. § 12132, *with* 29 U.S.C. § 794(a). But both statutes are "governed by the same standards," so this Court typically analyzes them together. *J.S., III ex rel. J.S., Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017) (per curiam); *see also L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1301 n.2 (11th Cir. 2022). This brief takes the same approach and refers to them jointly as "the Acts," or sometimes simply as "the ADA."

The Acts broadly "forbid discrimination on the basis of disability in the provision of public services." *J.S.*, 877 F.3d at 985. Congress aimed to eliminate not just "outright intentional exclusion" but also discrimination through "thoughtlessness and indifference" or "benign neglect." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (quoting 42 U.S.C. § 12101(a)(5)); *L.C. ex rel. Zimring v. Olmstead*, 138 F.3d 893, 901 (11th Cir. 1998) (quotation marks omitted), *vacated in part on other grounds*, 527 U.S. 581 (1999). To that end, the Acts instruct public entities to "modif[y] [their] existing . . . practices" so that disabled people have "an equal opportunity to benefit from [public services]." *See PGA Tour*, 532 U.S. at 675 (quoting § 12101(a)(5)); *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012).

6

The Acts' broad coverage extends to local governments' emergency services, including police response.  As the Supreme Court explained in *Pennsylvania Department of Corrections v. Yeskey*, "the ADA plainly covers state [and local] institutions *without* any exception."  524 U.S. 206, 209–12 (1998).  It held there that the ADA applies to prisons, and its reasoning applies equally to police services.  *See id.*  In implementing regulations, the Department of Justice too has decreed that "law enforcement [must] make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities."  28 C.F.R. Pt. 35, App. B.  Guided by these authorities, this Court has also recognized that police encounters can trigger ADA claims.  *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1084–85 (11th Cir. 2007).  Title II's "catch-all" prohibition against "subject[ing] [disabled people] to discrimination," this Court has held, covers discrimination by police, even "during an arrest."  *Id.* (quoting *Bledsoe*, 133 F.3d at 822).  A fortiori, it covers discrimination by police when responding to an emergency.  *See id.*  Simply put, it "prohibits all discrimination by a public entity, regardless of the context."  *Id.* at 1085.

## 2.    Dani, a young person disabled by mental illness, experiences a mental-health crisis.

In April 2022, Dani was twenty-eight years old.  A10 at 4.  They had been diagnosed with schizoaffective disorder, a mental illness that caused them to suffer depression, paranoia, and suicidal thoughts.  A10 at 11.  Dani's illness was so severe that they lived with their parents,

7

Deborah and Robert, who helped them attend treatment and take their medication. A10 at 12. Not all mental illness is disabling, but Dani's was. A10 at 11–12.

On the day Dani was killed, Deborah was concerned that Dani might have skipped their medication. A10 at 12. Dani's behavior had become erratic and Deborah worried that they might engage in self-harm. A10 at 12–13. Deborah wanted to keep Dani safe, so she called 9-1-1 and asked for a crisis-intervention team. A10 at 13–14. She told dispatch that Dani was experiencing a mental-health crisis but "had not hurt anyone." A10 at 14. Dispatch relayed to the responding personnel that this was a "'psych suicide' call." A10 at 14.

### 3. Gwinnett County responds to mental-health crises with police officers untrained in crisis intervention.

For nearly two decades, Georgia's police academies have offered a forty-hour course in crisis-intervention training, or "CIT." A10 at 23–24. The course is a collaborative effort among mental-health advocacy organizations and law-enforcement groups. *Id.* Its sponsors include the Georgia Bureau of Investigation and the Georgia Association of Chiefs of Police, and its mission is to equip police officers to "assist those with mental illnesses and other brain disorders in crisis" and "protect [their] rights." *Id.*

One of the explicit goals of the course is to train officers to comply with the ADA when responding to mental-health emergencies. A10 at

24–25. It teaches them "how to recognize" a mental-health crisis and how to respond to it by "modify[ing] routine practices and procedures," "dedicat[ing] more time," and "exercis[ing] more sensitivity"—in short, it teaches them to "de-escalate" such crises. *Id.* De-escalation techniques—like projecting a calm demeanor, "using a low tone of voice," creating distance, "slow[ing] things down," and avoiding drawing weapons when possible—have been proven not only to improve outcomes for people in crisis but also to increase officer safety. A10 at 33. They also help ensure that people with mental disabilities receive the same "services or protections"—that is, *help*—"that [would] be extended to someone else in a similar circumstance." A10 at 24–25. That is why crisis-intervention training has become an industry standard, and why many other jurisdictions like Gwinnett County crisis-train their police officers as a matter of course. A10 at 23–24, 33, 40.

Gwinnett does not crisis-train its police officers. A10 at 23. Its emergency dispatch system receives around ten suicide-related calls every day, adding up to hundreds of calls per month and thousands per year. A10 at 15. Gwinnett responds to these mental-health emergencies with police officers, "typically in isolation." A10 at 15–16. Even when they're accompanied by other personnel, the events of this case show that police typically assume command and can issue orders that the other first responders must obey. *See, e.g.*, Miller Video 3:28–4:17; A10 at 28, 30–

They wield such authority even though, by and large, they have no training in crisis intervention. A10 at 23, 16.

Nor does Gwinnett send mental-health professionals with the first-response team to guide officers to respond appropriately to mental-health crises. A10 at 22, 26, 33. As of April 2022, it had only one mental-health "co-responder" unit, made up of one officer and one part-time mental-health clinician who worked about 12 hours per week. A10 at 20–21, 26. Needless to say, in a county of a million people, that lone unit couldn't respond to most mental-health emergencies. A10 at 21. Instead, it responded only when an officer on the scene asked for its support. A10 at 22. So Gwinnett's first (and often only) response to a mental-health emergency was to send armed police with no training in responding to mental-health emergencies. A10 at 19, 23–25.

That's what happened here. After Deborah called 9-1-1, the County dispatched three police officers—Robert Miller, Kevin Mendez, and a third officer whose name doesn't appear in the record—to the Laubscher home. A22 at 2–4; A10 at 29. None of them had any training in crisis intervention. A10 at 39. Two firefighters with EMT training also responded, but as explained above, the officers were in command of the response (or at least a reasonable jury could so find)—and Mendez in particular "installed himself as the de facto leader of the group." A10 at 27–28. From the moment he arrived, Mendez exacerbated Dani's

10

mental-health crisis and thwarted the firefighters' efforts to de-escalate it. A10 at 28–32. And ultimately, his actions led to Dani's death. *Id.*

### 4. Kevin Mendez, a police officer untrained in crisis intervention, kills Dani.

Miller was first to arrive at the Laubscher home, along with the two firefighters. Miller Video 1:53. Deborah met them at the door. *Id.* at 2:43. She told them that Dani was "not a threat" and wasn't "attacking" anyone, but she believed they were off their medications and may be in psychosis as a result. *Id.* at 2:42–2:50; A10 at 14. She also said she thought Dani might have taken hallucinogens. Miller Video 2:42–2:50.[2] The firefighters entered the home first, followed by Miller. *Id.* at 3:00–3:05; A10 at 27. As they went in, Deborah told them that Dani had "a little switchblade." Miller Video 3:00–3:05.

The Laubschers' front door opens to a small landing and a staircase that leads to the second floor. Miller Video 3:04. To the left is a dining room, and to the right a parlor. *Id.* at 3:04; Mendez Video 2:27. When the first responders stepped inside, Dani was at the top of the stairs. Miller Video 3:04–3:10. The firefighters went halfway up and began talking to Dani, saying "take it easy" and "I'm here to help," and calmly asking Dani to put the knife away. A10 at 27; Miller Video 3:08–3:17. Miller, from the bottom of the stairs, also calmly told Dani to put the knife down.

---

[2] Toxicology reports later showed that "the only drugs in Dani's system were those that were prescribed for mental illness." A10 at 13, 15.

11

Miller Video 3:17–3:24. Dani was off-camera for this part but was apparently intermittently complying with instructions, because Miller thanked them a couple of times. *Id.* at 3:26–3:27, 3:34–3:35.

Miller ordered the firefighters to retreat. Miller Video 3:28–3:31. The one closer to Miller backed off, but the firefighter closer to Dani tried a little longer to coax Dani down in a quiet, reasonable tone. *Id.* at 3:28–4:17. Following the firefighters' example, Miller also tried to defuse the situation, asking Dani to put the knife down and saying, "Let's talk about it." *Id.* Dani, meanwhile, mostly stayed at the top of the stairs. *Id.* at 4:17–4:35. Occasionally, Dani took a few steps down. *Id.* Each time, Miller asked them to back up—and each time, they did. *Id.*

Then Mendez arrived. Miller Video 4:26; Mendez Video 00:32.[3] He immediately installed himself as the de facto incident commander, ordering Deborah to exit her home and telling Miller to use his taser on Dani. Mendez Video 00:32–1:28; A10 at 28–29. He pulled out his gun and pointed it at Dani, flashing its light at them. A10 at 29. Miller continued to try to reason with Dani: "Put the knife down. That's all you have to do. Put it down on the ground. Put it down on the ground. Let us talk." Mendez Video 00:46–1:04. Miller told Mendez he didn't want to use his taser because of "[t]he way [Dani was] gonna fall" down the

---

[3] Miller's video is 3:54 ahead of Mendez's. At 4:26 of Miller's video, he shouts "hey, hey, hey!", which can be heard at 00:32 of Mendez's video.

12

stairs. Miller Video 5:22–5:26; A10 at 29. Dani took a sip of their drink and briefly lowered the knife. Mendez Video 00:46–1:02.

But then Mendez began to raise his voice and make threats: "You're going to get tased if you don't put the knife down, put the knife down now! PUT the knife down!" Mendez Video 1:34–1:40. Dani descended one step lower than before, and Mendez exploded: "STOP! NOW!" *Id*. at 1:41–1:46. He also issued more commands to Miller: "Miller, step back! Miller! Step back! Step off!" *Id*. at 1:48–1:52. Miller obeyed. *Id*. at 1:51–1:53.

At this point, a third officer shouted "Taser, taser!" and tased Dani. Mendez Video 1:50–1:56. Mendez yelled, "ON THE GROUND! TASE HIM AGAIN!" *Id*. at 1:50–1:56. Dani tried to get on the ground and stood back up, and the third officer tased them again. *Id*. at 1:56–2:01. Mendez raised his gun into a firing stance. *Id*. at 1:58. Dani tried to retreat but instead, incapacitated by the taser, fell headfirst down the stairs and onto the landing. *Id*. at 2:01–2:12.

As Dani tried to stand up, a firefighter jumped on Dani's back and, with Miller's help, tried to take the knife away. Mendez Video 2:13–2:30; Miller Video 6:08–6:25; A10 at 30. Mendez, his gun still trained on Dani (and now on the firefighter and Miller, too), roared at the firefighter to "LET HIM GO, LET HIM GO!" Mendez Video 2:14–2:16. The firefighter continued to wrestle Dani to the ground even as Mendez tried to

13

physically pull him off Dani.  *Id.* at 2:16–2:27; A10 at 30.  Eventually, Miller pulled the firefighter out by his arm.  Miller Video 6:22–6:26.

Dani began to stand again, and Mendez screamed, "I'M GONNA F—KING SHOOT YOU!"  Mendez Video 2:28–2:29.  At this, Miller yelled "HEY!  Don't shoot!"  Miller Video 6:25–6:26.  Mendez began shrieking non-stop:

> STOP!  STOP!  STOP—TASE HIM AGAIN!  TASE HIM AGAIN!  STOP—DON'T YOU F—KING STEP TOWARDS ME!  DON'T YOU F—KING DO IT!  TASE HIM AGAIN!

Mendez Video 2:31–2:42.  Dani was not walking toward Mendez.  *Id.* They were staggering around, disoriented, facing the other way.  *Id.*

Miller tased Dani again, and Dani fell forward onto the landing again.  Mendez Video 2:40–2:44.  Mendez went in to grab the knife, but Dani rolled over and raised an arm.  Miller Video 6:40–6:42.  Mendez shot them in the chest.  *Id.* at 6:42–6:44.

Gwinnett argued below, and the district court accepted, that Dani had "slashed the knife at Officer Mendez."  A22 at 5.  Not so:  Dani's knife hand was on the ground, farther from Mendez.  This is the last frame of Mendez's video before he fired the fatal shot:

14



Mendez Video 2:48.  As the still shows, the hand Dani raised was empty and turned away from him.  Dani had neither "slashed" at Mendez nor reached for his firearm.  A10 at 31; *cf.* A22 at 5.

In the eighteen seconds between when he screamed that he would "f—king shoot" Dani and when he shot them, Mendez screamed nearly nonstop.  Mendez Video 2:30–2:48.  He screamed at Dani, he screamed at Miller, he screamed at the firefighters.  *Id.*  Then he approached Dani, became startled by a sudden movement, and shot them.  *Id.*  The Gwinnett County Police Department conducted an investigation and concluded that "there were no violations of policy involved in Dani's death." A10 at 36.

### 5.    The district court dismisses the Laubschers' claims, ruling that the accommodations they described—such as crisis-intervention training—were unreasonable.

The Laubschers sued Gwinnett County under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, alleging that Gwinnett had failed to reasonably accommodate Dani's mental disability.[4]  A10 at 40–45. They described a number of ways Gwinnett could've reasonably accommodated people with mental disabilities, like giving officers crisis training, properly staffing a mental-health co-responder unit, or hiring mental-health clinicians to try to de-escalate over the phone.  A10 at 16, 20–26.

The district court dismissed for failure to state a claim.  A22 at 14. It first held, correctly, that Title II and § 504 apply to police services. A22 at 9.  But then it ruled that by sending "firefighters with medical training," Gwinnett had offered a "significant portion" of the accommodations the Laubschers had described.  A22 at 11.  The rest of the Laubschers' accommodations, the district court concluded, were "patently unreasonable" and "exceed[ed] the scope of Title II" and § 504 as a matter of law.  A22 at 12–14.

---

[4] Colloquially, "mental disability" is often used as a shorthand for developmental or intellectual disability.  But the ADA's definition of "disability" includes any "mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  So it includes psychiatric disorders that have that effect, and that's how this brief uses "mental disability."

Its analysis, however, was less than searching.  The district court considered only two accommodations, as it construed them:  (1) that Gwinnett County "cease dispatching police officers along with mental-health practitioners to mental-health calls" and (2) that it "mandate use of de-escalation techniques with a person brandishing a weapon because that person is likely experiencing a mental-health episode."  A22 at 12–13.  It is far from clear, however, that either is a fair characterization of what the Laubschers sought.  *See* A10 at 32–35, 42–44.  And the Laubschers did clearly identify several *other* accommodations that the district court overlooked, like having Gwinnett's officers attend the crisis training that the State of Georgia offers.  *Id.* at 23–25.  Because the court failed to address those accommodations, it didn't reach the question of whether, in failing to provide them, Gwinnett was deliberately indifferent to the risk that its emergency services would discriminate against people with mental disabilities.  A22 at 12–14.

The Laubschers appeal.  A28.

17

# STANDARD OF REVIEW

This Court reviews *de novo* whether a plaintiff has stated a claim. *Karantsalis v. City of Miami Springs*, 17 F.4th 1316, 1319 (11th Cir. 2021) (per curiam). It reads the complaint in the light most favorable to the plaintiff, accepting all allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Id.* So construed, if the complaint plausibly suggests that the plaintiff is entitled to relief under "any set of facts . . . consistent with the allegations," the motion to dismiss fails to carry the day. *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (quotation marks omitted).

Affirmative defenses, meanwhile, are the defendant's burden to plead and prove, so a complaint "should not ordinarily be dismissed" on those grounds. *Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1304 (11th Cir. 2020). Dismissal is proper only when the defense is "apparent on the face of the complaint." *Id.* Otherwise, the place to raise the defense is "in a responsive pleading." *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011) (citing *Jones v. Bock*, 549 U.S. 199, 211–14 (2007)).

# SUMMARY OF ARGUMENT

**1.** Under the ADA and RA, public entities may not discriminate against people with disabilities. They must offer them an equal opportunity to participate in or benefit from public services. This rule operates through the framework of "reasonable accommodations": If an entity *can* make a service accessible with reasonable accommodations, it *must*.

A plaintiff who claims that a public entity denied them reasonable accommodation bears the initial burden of identifying an accommodation that is both reasonable and necessary to their equal enjoyment of the service. This is not a high bar: The plaintiff need show only that in general, services *like* the one at issue can alleviate the effects of the plaintiff's disability with an accommodation that "seems reasonable on its face." The defendant may then assert the affirmative defense that offering the accommodation would fundamentally alter or unduly burden *its* service.

The Laubschers easily met their initial burden. Most importantly, they pointed to crisis training, an industry standard accommodation for people with mental disabilities. Other police departments crisis-train their officers as a matter of course, but Gwinnett's does not. Some also employ the other accommodations the Laubschers identified, like fully staffing mental-health co-responders or diverting crisis calls to mental-health providers. In short, the Laubschers proposed accommodations that were facially reasonable and necessary by the standards of Gwinnett's peers.

19

Then the burden shifted to Gwinnett to prove these accommodations would fundamentally alter its emergency services. It didn't meet that burden—and at the pleadings stage, it couldn't. Nothing in the Laubschers' complaint supports the notion that requiring crisis training—for just one example—would fundamentally alter the nature of emergency services. So if Gwinnett seeks to assert an affirmative defense, it must do so in a responsive pleading, marshal evidence, and press the defense at summary judgment—not in a motion to dismiss.

Still, the district court granted Gwinnett's motion. It held that by dispatching firefighters with the police officers, Gwinnett had "provided a significant portion" of the Laubschers' proposed accommodations, and that the rest were unreasonable. But the firefighters were trained as EMTs, not crisis responders—and in any event the officers, who had the authority to override the firefighters but not the training, sidelined them almost immediately. So while Gwinnett may have sent firefighters, it didn't offer people with mental disabilities an equal opportunity to benefit from its emergency services, and that is what the Acts require.

The district court barely analyzed the rest of the Laubschers' proposed accommodations. It assumed the Laubschers were asking it to micromanage police operations at the scene of an emergency and declined. But the Laubschers also identified a host of upstream *policy* changes that would've alleviated the effects of Dani's mental disability, including crisis-training Gwinnett's officers, properly staffing a mental-health co-

20

responder unit, and hiring remote mental-health clinicians. If those accommodations were unreasonable, the district court didn't explain why. They are not unreasonable, so this Court should reverse.

**2.** In addition to showing that the defendant engaged in disability discrimination, a plaintiff seeking damages must show that it did so with deliberate indifference. That means that it (1) knew that harm to a federally protected right was substantially likely and (2) failed to act on that likelihood. So if an official knows that a public entity's service doesn't offer people with disabilities an equal opportunity to benefit and fails to act, the entity is deliberately indifferent and liable in damages.

Gwinnett's senior leadership knew, among other things, that Gwinnett's emergency dispatch system fielded thousands of mental-health crisis calls every year; that Gwinnett's police officers had no crisis training but served as the County's de facto mental-health responders anyway; and that creating a system where armed, untrained police officers served as the primary response to mental-health emergencies would lead to dangerous situations for Gwinnett's mentally disabled residents.

The County argued below that the officials also needed knowledge of "prior similar incidents." This is without merit: There is no rule under the ADA that the first death is free. The officials knew Gwinnett didn't offer people with mental disabilities the same opportunity to benefit from its emergency services that it offered nondisabled residents, and they failed to take corrective action. As a result, Gwinnett is liable in damages.

21

# ARGUMENT

A mental-health crisis is not a crime. *See Robinson v. California*, 370 U.S. 660, 666 (1962) (holding that criminalizing mental illness would "doubtless" be cruel and unusual punishment); *Broomall v. State*, 391 S.E.2d 918, 922 (Ga. 1990) ("[S]uicide is not a crime in Georgia."). It is a unique type of emergency that calls for a unique type of public-safety response—crisis intervention. That is why crisis training is industry standard for first responders who respond to mental-health crises. Crisis training is how emergency services accommodate the needs of people in mental-health crises, who often suffer from mental disabilities.

Gwinnett did not meet that industry standard. It sent armed police officers with no crisis training to crisis calls, and it put them in charge of the response. And top Gwinnett officials knew this—it was a matter of Gwinnett policy and it happened thousands of times a year—and yet they failed to take corrective action. As a result, Gwinnett is liable in damages.

## 1. Gwinnett County discriminated against Dani Laubscher because it failed to reasonably accommodate Dani's mental disability.

The ADA and RA require public entities to give disabled people an equal opportunity to benefit from public services. In practice, that means that if an entity, with reasonable accommodations, *can* make a service accessible to disabled people, it *must*. The Laubschers identified several such accommodations, but the district court ignored most of them and

reinterpreted the rest as unreasonable demands to micromanage the police. This Court should reverse. The Laubschers met their burden to identify reasonable accommodations and should be allowed to proceed with their claims.

### 1.1. Under the ADA and RA, public entities must adapt their services to reasonably accommodate disabled people.

Congress enacted the ADA and RA to remedy "widespread discrimination against disabled individuals." *PGA Tour*, 532 U.S. at 674 (discussing ADA). Surveying the field, it found an overwhelming "volume of evidence"—hundreds of examples—showing "pervasive unequal treatment" of disabled people in the "administration of state services and programs," including "systematic deprivations of fundamental rights." *Lane*, 541 U.S. at 524–28. In response, it imposed an affirmative duty on public entities to ensure that their services do not exclude or discriminate against people with disabilities. *Karantsalis*, 17 F.4th at 1322. That is, it instructed public entities to give disabled people an "equal opportunity to participate in or benefit from" their public services. *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 900 F.3d 1270, 1295 (11th Cir. 2018).[5]

---

[5] *A.L.* is a Title III case, 900 F.3d at 1273, but this Court construes Title III's anti-discrimination standard in line with the Rehabilitation Act's anti-discrimination standard, and the Rehabilitation Act's in line with Title II's. *See J.S.*, 877 F.3d at 985 ("Discrimination claims under [Title II

What that means in practice is that public entities must offer "reasonable accommodations" to people with disabilities so they can "obtain the *same* [public services] that those without disabilities automatically enjoy." *U.S. Airways v. Barnett*, 535 U.S. 391, 397 (2002).[6]  This reasonable-accommodation mandate applies not only during individual interactions with disabled people—at retail, so to speak—but also in wholesale: "[F]acially neutral, uniformly applied policies" can trigger discrimination claims if they do not reasonably accommodate people with disabilities. *See L.E.*, 55 F.4th at 1303; *compare, e.g.*, *Liese*, 701 F.3d at 342–44 (retail), *with Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763, 773 (11th Cir. 2020) (wholesale), *and A.L.*, 900 F.3d at 1296–98 (same).

To state a claim under the Acts, a plaintiff must allege that (1) they are a qualified individual with a disability; (2) they were "excluded from participation in," "denied the benefits of," or otherwise "subjected to discrimination under" the defendant entity's services; and (3) the exclusion, denial, or other discrimination was because of the plaintiff's disability.  29

---

of] the ADA and the Rehabilitation Act are governed by the same standards[.]"); *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 830 (11th Cir. 2017) ("[Title III] ADA and RA claims are governed by the same substantive standard of liability."). So this Court's Title III cases offer authoritative guidance on the construction of Title II.

[6] *Barnett* is a Title I case, but it describes the same framework for accommodation as RA, Title II, and Title III cases. *Compare* 535 U.S. at 397–98, 401–02 (Title I), *with A.L.*, 900 F.3d at 1293–95, 1298–99 (RA and Title III), *and* 28 C.F.R. § 35.130(b)(7)(i) (implementing Title II); *see also* n.5, *supra*.

U.S.C. § 794(a); 42 U.S.C. § 12132; *Karantsalis*, 17 F.4th at 1322.  If the claim is based on a failure to accommodate, the plaintiff bears the initial burden of identifying an accommodation that is "both 'reasonable' and 'necessary'" to the plaintiff's equal enjoyment of the service.  *A.L.*, 900 F.3d at 1292; 28 C.F.R. § 35.130(b)(7)(i).  Once the plaintiff makes that showing, the defendant entity may assert the affirmative defense— which it bears the burden to prove—that the proposed accommodation would fundamentally alter its service.  *A.L.*, 900 F.3d at 1292; 28 C.F.R. § 35.130(b)(7)(i).

Everyone agrees that Dani Laubscher had a disability and was otherwise "qualified" to receive emergency services from Gwinnett County, *see, e.g.*, A12-1 at 2–3, so the key dispute here is whether Gwinnett excluded Dani from, denied Dani the benefits of, or otherwise subjected Dani to discrimination in its emergency services.  *See* 29 U.S.C. § 794(a); 42 U.S.C. § 12132.  The Laubschers allege that, by failing to offer reasonable accommodations for people with mental disabilities in its emergency services, it did.  A10 at 40–45.

### 1.2. The Laubschers met their burden to identify facially reasonable ways emergency services can accommodate people with mental disabilities.

The Laubschers bore the initial burden to identify an accommodation that was both reasonable and necessary for mentally disabled people to have an equal opportunity to benefit from Gwinnett's emergency

services.  This initial burden "presents a relatively low bar":  The plaintiff need only identify an accommodation that "seems reasonable on its face." *Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1265 (11th Cir. 2019) (quoting *Barnett*, 535 U.S. at 401).[7]  What's more, that inquiry is "generalized" rather than "case-specific":  The plaintiff need show only that the accommodation seems reasonable "ordinarily or in the run of cases."  *Willis v. Conopco, Inc.*, 108 F.3d 282, 286 n.2 (11th Cir. 1997); *Barnett*, 535 U.S. at 401–02.  In addition, the plaintiff must show that the proposed accommodation is necessary—that it "alleviates the effects of a disability."  *Schaw*, 938 F.3d at 1269 (quotation marks omitted). Putting these principles together, the plaintiff must show that services like the one at issue generally can alleviate the effects of the plaintiff's disability with a reasonable accommodation.

The Laubschers identified accommodations that easily clear this low bar.  By and large, the accommodations they described were *industry standard* practices for ensuring that emergency services accommodate people with mental disabilities.  Most importantly, they pointed out that Gwinnett should've required its police officers to take crisis-intervention training.  A10 at 23–25.  Not only does Georgia offer a CIT course *for*

---

[7] *Schaw* is a Fair Housing Act case, but—as the internal citation to *Barnett* suggests—this Court interprets that statute's reasonable-accommodation framework in line with those of the ADA and the RA.  938 F.3d at 1265 n.2.

*that purpose*, but the course's express mission is to train officers in ADA compliance. *Id.* Crisis-intervention techniques have proven effective at resolving mental-health crises safely, which is why major policing associations endorse their use. A10 at 33. In other jurisdictions like Gwinnett, crisis training is "standard." A10 at 23; *see also id.* at 40 (all Minneapolis officers, for example, are crisis-trained).

But crisis-training all its officers is not the only way Gwinnett could've accommodated people with mental disabilities. The Laubschers proposed several other accommodations that would've fit the bill, too:

- Ensuring that only crisis-trained police officers were dispatched to mental-health crises, A10 at 16;

- Staffing enough designated mental-health co-responder units to provide adequate and timely coverage for the whole county, A10 at 20–22, 25–26;

- Sending mental-health clinicians to mental-health emergencies as a matter of course, A10 at 18–19;

- Empowering 9-1-1 dispatchers to call for mental-health response units rather than leaving that decision to responding police officers, A10 at 22–23;

- Diverting 9-1-1 callers in crisis to on-call remote mental-health clinicians, who could try to de-escalate over the phone, A10 at 16; and

27

- Tracking "high utilizers" of emergency mental-health services, both to refer them for non-emergency resources and to better inform first responders that the caller might need accommodation, A10 at 14, 16–17.

Like crisis-intervention training, these accommodations have also been widely accepted as necessary and reasonable by emergency services across the country. A10 at 16–17, 23. Phoenix, Arizona, diverts hundreds of calls per month to mental-health providers instead of law enforcement. A10 at 39. Minneapolis employs many more mental-health professionals in its mobile response unit than does Gwinnett—and they work full-time. A10 at 38. Closer to home, even the Gwinnett County Sheriff's Office has a robust mental-health task force. A10 at 27. In short, the policy accommodations the Laubschers identified were facially reasonable and necessary as judged by Gwinnett's peers.

The Laubschers also explained how these accommodations would have "alleviate[d] the effects of [Dani's] disability." *Cf. Schaw*, 938 F.3d at 1269. Crisis training would've taught the officers that they needed to speak slowly and calmly to Dani—rather than shouting conflicting commands and threats—and that pointing weapons at Dani could exacerbate their mental-health crisis. A10 at 33–34. Staffing on-call mental-health clinicians would've allowed dispatch to divert the call to professionals with the training to de-escalate Dani over the phone. A10 at 16, 39. Operating enough mental-health co-responder units would've enabled the

28

officers to call one for support, and a mental-health clinician could then have guided the officers to respond appropriately to Dani's mental-health crisis.  A10 at 22, 26, 33.  In short, the Laubschers identified a range of accommodations that were necessary and reasonable "in the run of cases." *Cf. Schaw*, 938 F.3d at 1265, 1267 (quotation marks omitted).

It's worth emphasizing again that to carry their burden, the Laubschers needed only to identify *facially* reasonable accommodations—which is to say, adjustments that "seem reasonable" as a general matter.  *Schaw*, 938 F.3d at 1267.  And as the Laubschers explained, experts across the field of policing—including at Georgia's own police training academies—endorse these policies for the very purpose of ADA compliance.  A10 at 24–25, 33.  So the Laubschers described accommodations that were facially reasonable and necessary *by industry consensus.*

The district court held that none of this mattered because Gwinnett "provided a significant portion" of the Laubschers' proposed accommodations by "dispatching firefighters with medical training."  A22 at 11.  Three problems with that.  First, the firefighters were trained as EMTs, not as crisis responders.  A10 at 27, 34.  Second, it's at least a reasonable inference from the complaint and video that even though firefighters were there, the police were in charge—and at the pleading stage, the Laubschers get the benefit of that inference.  A10 at 28 ("Mendez installed himself as the de facto leader of the group of first responders and enacted extant Gwinnett policy . . . that law enforcement responses to

29

[mental-health crises] take precedence over health-based responses.”); Mendez Video at 1:48–2:30 (in which Mendez issues orders to firefighters and others at the scene); *cf. Karantsalis*, 17 F.4th at 1319. Third, whoever was in charge, the police officers were the ones with firearms. So *even if* the firefighters had co-equal authority and *even if* they were crisis-trained, the responders with the ability and the power to use lethal force had no training in responding to mental-health crises. A10 at 25.

At bottom, the question is not whether Gwinnett provided a "significant portion" of the Laubschers' proposed accommodations. *Cf.* A22 at 11. It's whether Gwinnett's emergency services provided mentally disabled people with "an equal benefit and a like experience to that of its nondisabled [residents]." *A.L.*, 900 F.3d at 1290; *see also, e.g., Liese*, 701 F.3d at 343 (phrasing the question as whether disabled people have "an equal opportunity to benefit" from the service). People call emergency services when they need help, and Gwinnett sends help by sending police to burglary calls and medics to heart attacks. To mental-health crises, however, Gwinnett doesn't send help—it sends armed officers untrained in crisis-intervention. Sending other personnel with tangential training and no authority doesn't change that. As a result, mentally disabled people do *not* have an "equal opportunity to benefit" from Gwinnett's emergency services. *Cf. Liese*, 701 F.3d at 343. So the Laubschers met their burden to show a prima facie case of discrimination in violation of the ADA.

### 1.3. Gwinnett didn't meet its burden to show those accommodations would fundamentally alter its emergency services—and at the pleadings stage, it couldn't.

Once a plaintiff has shown a facially reasonable and necessary accommodation, the burden shifts to the public entity to prove that "the accommodation would nonetheless impose an 'undue burden' or result in a 'fundamental alteration' of its program." *Schaw*, 938 F.3d at 1266 (quoting *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1220 (11th Cir. 2008)); 28 C.F.R. § 35.130(b)(7). These are affirmative defenses to liability. *See Schaw*, 938 F.3d at 1265 & n.3. For undue burden, the public entity must plead and prove "special (typically case-specific) circumstances" that cause hardship "in the context of the particular agency's operations." *Barnett*, 535 U.S. at 402 (quotation marks omitted). For fundamental alteration, the entity must show that the proposed accommodation "would eliminate an essential aspect of the relevant activity." *Schaw*, 938 F.3d at 1266 (cleaned up). Unlike the more generalized facial-reasonableness question, both of these inquiries "turn on the facts of each case." *Id.*

Gwinnett didn't come close to making out these "fact-specific" defenses. *Cf. Schaw*, 938 F.3d at 1266 (quotation marks omitted). It didn't even attempt to argue that the Laubschers' proposed accommodations would impose "an undue administrative or financial burden." *See* A12-1 at 11–13, 15–17; A20 at 7–9. Nor did it argue directly that offering them

31

would fundamentally alter the nature of its emergency services, though its briefing could be read that way. *See, e.g.*, A12-1 at 12 (complaining that the Laubschers "sought to undermine police policies that involve exigencies and quickly changing circumstances"). But even with that generous reading, Gwinnett didn't argue why the proposed accommodations—like having its officers take crisis-intervention training—would "eliminate an essential aspect of [its emergency services]" or "transform the [service] into another one." *Cf. Schaw*, 938 F.3d at 1266 (quotation marks omitted); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001).

Nor could it have made those arguments at the pleading stage. In general, affirmative defenses cannot form the basis for dismissal unless the facts that support them are "apparent on the face of the complaint." *Isaiah*, 960 F.3d at 1304. And the fundamental-alteration defense in particular requires a "fact-specific, case-by-case inquiry" that can rarely be decided on the pleadings. *See Schaw*, 938 F.3d at 1266 (quotation marks omitted).[8] Nothing in the Laubschers' complaint supports the notion that requiring crisis training—for just one example—would transform emergency services into something else.

---

[8] In fact, with one exception (which doesn't detract from the point), every fundamental-alteration case cited in this section and the next were decided at summary judgment. *Schaw*, 938 F.3d at 1262; *Schwarz*, 544 F.3d at 1225; *Lucas*, 257 F.3d at 1252; *PGA Tour*, 532 U.S. at 669; *but see Nat'l Ass'n of the Deaf*, 980 F.3d at 769.

32

### 1.4. The Laubschers' proposed accommodations would not fundamentally alter Gwinnett's emergency services.

Even if Gwinnett had argued that the Laubschers' proposed accommodations would fundamentally alter its emergency services, it would've been mistaken. As this Court has memorably explained, "[t]he difference between the accommodation that is required and the transformation that is not is the difference between saddling a camel and removing its hump." *Lucas*, 257 F.3d at 1260. Thus in *PGA Tour, Inc. v. Martin*, the Supreme Court held that a golf tournament's "walking rule" was a "peripheral" rather than "essential" rule of competition, so allowing the plaintiff to use a golf cart would not "work[] a fundamental alteration" on the tournament. 532 U.S. at 689. By contrast, this Court explained in *Lucas v. W.W. Grainger, Inc.* that "eliminating squatting, bending, lifting, [and] carrying bin items" from a "Bins Sorter" position whose main job was to "sort[] small bin items from a cart and plac[e] them on racks" would've been closer to hump-removal surgery and thus was not required by the ADA. 257 F.3d at 1254, 1260.

This Court's nuanced decision in *Schwarz v. City of Treasure Island* further illustrates the line between a reasonable accommodation and a fundamental alteration. There, the Court reasoned that requiring a municipality to waive a zoning rule would cause a fundamental alteration "if the proposed use was incompatible with surrounding land uses" but not "if the proposed use is quite similar to surrounding uses expressly

33

permitted by the zoning code." 544 F.3d at 1221. The key, the Court explained, was to begin with the "basic purpose" of zoning—"bring[ing] complementary land uses together[] while separating incompatible ones." *See id*. Summing these cases up, this Court has explained that one "way to look at the 'essential'-ness (or 'fundamental'-ness) issue might be to ask, 'What is the basic purpose of the rule or policy at issue?'" *Schaw*, 938 F.3d at 1266.

The "basic purpose" of emergency services is to send trained first responders to help people in an emergency. *See* A10 at 18. Gwinnett already distinguishes among types of emergencies to send the most appropriate resources to each one—which is why physical-health emergencies, for instance, get EMTs as a matter of course. A10 at 18. So providing similarly targeted help for people in crisis would be a "'reasonable modification' of a service that is already provided," not a "transformation" of the service into something else. *Cf. Nat'l Ass'n of the Deaf*, 980 F.3d at 773; *Lucas*, 257 F.3d at 1260. A saddle, not surgery.

And the Laubschers proposed a suite of such reasonable modifications. A10 at 16, 23–25, 33, 38–40. Some were as modest as letting 9-1-1 dispatchers activate the County's mental-health response unit, or having police officers complete the State's readily available crisis-training course. A10 at 22–25. Rather than transform the program, such adjustments were necessary to give the mentally disabled "meaningful access" to emergency services, *cf. A.L.*, 900 F.3d at 1295 (quotation marks

34

omitted)—which is why, as the Laubschers alleged, they are "standard" in the industry, A10 at 23. At the pleadings stage, those allegations control. *Karantsalis*, 17 F.4th at 1319. So the County's affirmative defenses must await summary judgment. *See Bingham*, 654 F.3d at 1175.

### 1.5. The district court reached a contrary conclusion by redefining some of the Laubschers' proposed accommodations and disregarding the rest.

The district court overlooked most of the accommodations the Laubschers identified. Its decision contains no analysis of whether it would've been reasonable for Gwinnett to train its officers in crisis intervention, properly staff the co-responder unit, divert 9-1-1 callers in crisis to remote clinicians, or track "high utilizers" of emergency mental-health services. *See* A22 at 11–14; *cf.* A10 at 16–26. The court neither identified the "basic purpose" of Gwinnett's emergency services nor considered whether any of the Laubschers' proposed policy accommodations might fundamentally alter that purpose. *See Schaw*, 938 F.3d at 1266; A22 at 11–14. It didn't even explain whether it was analyzing the Laubschers' prima facie case or Gwinnett's affirmative defense. *See* A22 at 11–14.

Instead, the district court impermissibly "redefined" the Laubschers' proposed accommodations into straw men and knocked them down. *See L.E.*, 55 F.4th at 1302–03 (holding that such "re-definition" was an abuse of discretion). First, it addressed the notion that Gwinnett should "cease dispatching police officers along with mental-

35

health practitioners to mental health calls." A22 at 12. That would be "patently unreasonable," it explained, because "[a] suicide call, by nature, presents volatile circumstances." A22 at 12. But the Laubschers suggested nothing of the sort. Instead, they alleged that Gwinnett should've sent appropriately trained first responders, either by having its police officers take crisis training (readily available at the State's police academies) or by appropriately staffing the mental-health co-responder unit. A10 at 20–26.

Next, the district court explained that it would be unreasonable to "mandate use of de-escalation techniques with a person brandishing a weapon because that person is likely experiencing a mental-health episode." A22 at 12. Again, that's not what the Laubschers proposed. They alleged that Gwinnett should've *equipped* its first responders to use crisis-intervention techniques when they *knew* they were responding to a crisis call—not that it should've *forced* first responders to use such techniques whenever someone with a weapon *might* have been in a mental-health crisis. A10 at 16, 18–19.

And that was the extent of the district court's reasonableness analysis—it rejected the rest of the Laubschers' proposed accommodations without discussion. It mentioned crisis-training Gwinnett's police officers only in an oblique (and mystifying) quotation from another case in the same district: "That every officer should have been *trained* in [de-escalation] methods does not mean that the methods should necessarily have

36

been *applied* in the circumstance." A22 at 13–14 (quoting *Williams v. DeKalb Cnty.*, No. 23-738, Dkt. 16 at 15 n.2 (N.D. Ga. Sept. 21, 2023)). Whatever the plaintiffs alleged there, the Laubschers *did* suggest that Gwinnett officers should have been trained in de-escalation methods. A10 at 23–25. The district court's failure to contend with that suggestion, or indeed with any of the accommodations the Laubschers actually proposed, was error. *See L.E.*, 55 F.4th at 1302–03.

At bottom, the district court's mistake was that it misconstrued the Laubschers' arguments as addressed entirely to Mendez and Miller's on-the-scene actions. *Cf. L.E.*, 55 F.4th at 1302–03. Yes, *some* of the accommodations the Laubschers identified, like using de-escalation techniques when dispatched to a crisis call, went to the officers' actions on the scene. *E.g.*, A10 at 32–35. The Laubschers no longer press those here. But others, like training officers in de-escalation or crisis intervention, were directed at Gwinnett's upstream policy decisions. *See* A10 at 16–26; *see id.* at 2 ("Defendant's actions flowed foreseeably and inevitably from its systemic failures at several levels.").

As applied to those upstream policy decisions, the district court's rationales for dismissal—that the Laubschers were asking the court to "require that the County disregard the safety of its medical responders" or "[l]imit[] officers' ability to respond to a quickly evolving situation"—make no sense. *Cf.* A22 at 12–13. If anything, crisis training has been shown to "*improve* officer safety." A10 at 33 (emphasis added). Similarly,

37

the district court's reliance on *Bircoll*—which explains that officers may need to "instantaneously identify, assess, and react" to "exigent circumstances" at the scene of an encounter—also misses the mark, because policymaking involves no such exigent circumstances or instantaneous decisions. *See* A22 at 11–14; *cf.* 480 F.3d at 1084 (quotation marks omitted). The proper standard comes from cases like *PGA Tour* and *Schaw* and *A.L.* Under those cases, the Laubschers met their burden to propose facially reasonable, necessary accommodations and the district court should not have dismissed their claims. *See* Parts 1.1–1.2, *supra*.

This Court could end its analysis there. *See, e.g.*, *Schaw*, 938 F.3d at 1268 (declining to decide in the first instance whether the plaintiff's requested accommodations would "modify a core aspect" of the defendant's program or "merely inconvenience" it); *A.L.*, 900 F.3d at 1298–99 (remanding such "knotty issues" of fact to the district court). But, for the reasons discussed in Parts 1.3–1.4, the Court should also hold that Gwinnett cannot make out its undue-burden and fundamental-alteration affirmative defenses from the face of the Laubschers' complaint and must instead raise its defenses in a responsive pleading, to be tested at summary judgment. *See Bingham*, 654 F.3d at 1175.

## 2. Gwinnett County is liable in damages.

The district court didn't reach the issue of damages, *see generally* A22, and this Court need not tackle it in the first instance. *Silva v. Baptist*

*Health S. Fla., Inc.*, 856 F.3d 824, 841 (11th Cir. 2017) (remanding for the district court to take the first crack at that issue). But Gwinnett will likely argue that even if it violated the ADA, the Court should affirm on the alternative ground that it was not deliberately indifferent. If the Court chooses to reach that issue, Gwinnett knowingly sent armed police officers untrained in crisis intervention to respond to mental-health crises, and in doing so, knowingly abandoned its duty to provide mentally disabled people an equal opportunity to benefit from its emergency services. That is deliberate indifference—so Gwinnett is liable in damages.

### 2.1. Damages liability under the ADA and RA turns on deliberate indifference.

To recover damages under Title II or the RA, a plaintiff must show not only that the public entity engaged in disability discrimination but also that it did so with deliberate indifference. *Silva*, 856 F.3d at 831. Deliberate indifference, in this context, means the public entity "[1] knew that harm to a federally protected right was substantially likely and [2] failed to act on that likelihood." *Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1135 (11th Cir. 2018). An entity has the knowledge required when an official with the authority to institute corrective measures has actual knowledge of discrimination in the entity's programs or services. *Liese*, 701 F.3d at 349. In other words, if an official knows that the entity's program or service doesn't offer people with disabilities "meaningful access or an equal opportunity to gain the same benefit as [their]

39

nondisabled peers" and fails to take corrective action, the entity is deliberately indifferent and liable in damages. *See A.L.*, 900 F.3d at 1294–95 (quotation marks omitted); *Liese*, 701 F.3d at 349.

The official's knowledge, in turn, is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence"—and it also may be inferred "from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

### 2.2. Gwinnett acted with deliberate indifference by knowingly sending armed officers untrained in crisis response to mental-health crises.

Gwinnett's senior leadership had "actual knowledge of discrimination" in Gwinnett's emergency-response program and "fail[ed] adequately to respond." *Cf. Liese*, 701 F.3d at 349 (quotation marks and emphasis omitted). According to the Laubschers' complaint (and all these allegations are eminently plausible), the chief of police, senior staff, and county commissioners all knew:

- That Gwinnett's emergency dispatch system fielded thousands of mental-health crisis calls every year, *see* A10 at 15, 21 ("Gwinnett leadership knew . . . [of] the documented volume of mental health emergencies in the County.");

- That there was a pressing need to provide emergency services tailored to accommodate mental-health crises, *see* A10 at 19 (Gwinnett told its residents in 2021 that "if they call 911" for a

40

mental-health emergency, "we have officers that are trained to get them to the right resources");

- That Gwinnett's trained mental-health response was composed of a single "understaffed and grossly inadequate" co-responder unit that "could not respond in time to emergencies, and, more often than not, could not respond at all," A10 at 21, 25–26;

- That Gwinnett had "failed to train [its] officers in the basics of crisis intervention [or] de-escalation" and yet used its officers as "the de facto mental health responders for the County," A10 at 42–43;

- That the State of Georgia offered a crisis-intervention course for police officers—or at least, a jury could reasonably infer that the officials knew that, since the course had been available since 2006 and was sponsored by, among other organizations, the Georgia Association of Chiefs of Police, *see* A10 at 23–25; and

- That "creating a system where untrained GCPD officers served as the primary response to mental health emergencies would lead to dangerous situations for Gwinnett's mentally disabled residents," A10 at 25.

In short, high-ranking Gwinnett officials knew for years that armed officers untrained in crisis intervention were being sent as first responders to mental-health crises.  And they knew this put Gwinnett's mentally disabled residents in danger.  And yet—at least as of the time Mendez killed

41

Dani, in April 2022—these officials had failed to adopt reasonable accommodations like those the Laubschers identified. A10 at 23–26.

Gwinnett argued below that its officials lacked "actual knowledge" of "prior similar incidents" and thus could not have known that its emergency-response program violated the Acts. A12-1 at 10–11. That argument is flawed twice over.

First, it misperceives the knowledge required for deliberate indifference. Deliberate indifference requires that an official have "actual knowledge of discrimination in the organization's programs"—not that the official foresee the catastrophic consequences. *See Liese*, 701 F.3d at 349 (cleaned up). The discrimination here is Gwinnett's failure to reasonably accommodate mentally disabled people in its emergency services. The shooting is the tragic "downstream consequence[ ]" of that failure, but it's not the discrimination itself. *Cf. Silva*, 856 F.3d at 834. In tort terms, the *duty* under the ADA is the duty to reasonably accommodate people with disabilities; the *breach* is Gwinnett's failure to accommodate people with mental disabilities; and the *harm* is the shooting that followed from the breach. Deliberate indifference requires knowledge of breaches, not of specific harms. *See Crane*, 898 F.3d at 1135.

This distinction surfaces with especial clarity in a line of this Court's cases about hearing-impaired patients in hospitals. A plaintiff need not show, the Court explained there, that the defendant hospital's failure to provide interpreters or other appropriate auxiliary aids caused "actual

42

deficient treatment." *Silva*, 856 F.3d at 829; *Crane*, 898 F.3d at 1134–35. Such "downstream consequences" might be "remote, attenuated, ambiguous, or fortuitous," so it's enough for the plaintiff to show that he was denied "an equal opportunity to benefit from" the hospital's treatment. *Silva*, 856 F.3d at 834; *Liese*, 701 F.3d at 343.

In other words, the ADA and RA target the breach—not the result. *See Silva*, 856 F.3d at 834. That's why it's no defense for the hospital to say the plaintiff "ultimately receive[d] the correct diagnosis or medically acceptable treatment." *Silva*, 856 F.3d at 833–34. It still denied the patient an "equal *opportunity* to benefit" from its services, and so it still breached its duty to him. *Id.* (quotation marks omitted). And that's also why, for deliberate indifference, the plaintiffs in those cases had to show that doctors knew "ineffective communication"—not misdiagnosis or incorrect treatment—"was substantially likely to occur." *Crane*, 898 F.3d at 1135.

So too here. Even if the shooting hadn't happened, Gwinnett still denied Dani the "equal opportunity to benefit" from its emergency services, so it still breached its duty to Dani. *Cf. Liese*, 701 F.3d at 343; *Silva*, 856 F.3d at 829, 833–34; *see also, e.g.*, *A.L.*, 900 F.3d at 1295. And Gwinnett officials had ample knowledge that such breaches were not just "substantially likely" but occurring every day. *Cf. Crane*, 898 F.3d at 1135. They knew Gwinnett's emergency dispatch got thousands of crisis calls per year; they knew Gwinnett's officers lacked crisis training;

43

and they knew those untrained, armed police officers were the "de facto mental health responders for the County." A10 at 15, 23, 42. Even if those officers had "fortuitous[ly]" never shot anyone before, there is no rule under the ADA that the first death caused by the discrimination is free. *See Silva*, 856 F.3d at 829, 834. Gwinnett's preferred rule—that officials must have knowledge of "prior similar incidents"—has no basis in law. *Cf.* A12-1 at 11.

Second, in any event, deliberate indifference doesn't require knowledge that a violation already happened—just that one is "substantially likely" to occur. *Liese*, 701 F.3d at 344. So even if the Court were to focus on the downstream consequence of Gwinnett's policy decisions—the shooting—the Laubschers need not show that Gwinnett officials had "actual knowledge" of "prior similar incidents." A12-1 at 10–11. It is enough that they knew that "creating a system where [armed,] untrained GCPD officers served as the primary response to mental health emergencies would lead to dangerous situations for Gwinnett's mentally disabled residents." A10 at 25. That allegation—plausible enough to survive a motion to dismiss—shows that Gwinnett officials knew such consequences were "substantially likely" and failed to act. *Cf. Liese*, 701 F.3d at 344.

In sum, based on the Laubschers' allegations, a reasonable jury could conclude that Gwinnett County knew its emergency services didn't give mentally disabled people "meaningful access or an equal opportunity

44

to gain the same benefit as [their] nondisabled peers," and it failed to take corrective action. *Cf. A.L.*, 900 F.3d at 1294–95 (quotation marks omitted). That is enough for Laubschers to pursue damages. *Liese*, 701 F.3d at 344. This Court should let their claim proceed.

# CONCLUSION

For all these reasons, the Court should reverse.

Dated:  May 23, 2025                    Respectfully submitted,

By:  */s/Athul K. Acharya*
            Athul K. Acharya

PUBLIC ACCOUNTABILITY
Counsel for Plaintiffs-Appellants

45

## CERTIFICATE OF SERVICE

I certify that I have served a copy of this Appellants' Opening Brief by filing the document with the ECF system, which will automatically electronically serve counsel of record who are registered users of the Court's electronic-filing system.

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(g) because it contains 10,115 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the word count feature of Microsoft Word for Mac 16.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface, ITC Galliard Pro, using a 14-point or larger font.

Dated:  May 23, 2025          Respectfully submitted,


By:  */s/Athul K. Acharya*
          Athul K. Acharya

PUBLIC ACCOUNTABILITY
Counsel for Plaintiffs-Appellants